# In the United States Court of Federal Claims

No. 16-817C
(Filed: November 30, 2016)*
**\*Opinion originally filed under seal on November 21, 2016**

<table>
<tr><td>

SALLYPORT GLOBAL HOLDINGS,
INC.,

     Plaintiff,

v.

THE UNITED STATES,

     Defendant,

and

EXP FEDERAL, INC.,

     Defendant-Intervenor.

</td><td>

Bid Protest; Motion for Judgment on
the Administrative Record; United
States Army Corps of Engineers;
Harmless Error; Mandatory Minimum
Requirements

</td></tr>
</table>

*Stuart B. Nibley*, Washington, DC, for plaintiff.  *Andrew N. Cook*, *Amy M. Conant*, and *Christopher H. Bell*, Washington, DC, of counsel.

*Anand R. Sambhwani*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Douglas K. Mickle*, Assistant Director, for defendant.  *C. Clay Weisenberger*, Assistant Counsel, United States Army Corps of Engineers, Hunstville, AL, of counsel.

*Joseph D. West*, Washington, DC, for defendant-intervenor.  *Lindsay M. Paulin*, Washington, DC, of counsel.

**O P I N I O N**

**FIRESTONE**, *Senior Judge*.

This post-award bid protest concerns the unsuccessful bid of plaintiff Sallyport Global Holdings, Inc. ("Sallyport") for a contract with defendant United States Army Corps of Engineers (the "agency" or "government") to provide electrical safety assessments, repairs, materials and management within the United States Central Command. The contract was instead awarded to defendant-intervenor exp Federal Inc. ("exp Federal"), the incumbent contractor. Before the court are the parties' cross-motions for judgment on the administrative record filed pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC").

Sallyport argues that the award to exp Federal should be set aside for three reasons. First, Sallyport argues that it was arbitrary and capricious for the agency to find that Sallyport's proposal for the Project Manager position was deficient. Second, Sallyport argues that it was arbitrary and capricious for the agency to determine that Sallyport's representatives improperly contacted agency personnel during a blackout period. Third, Sallyport argues it was arbitrary, capricious, and contrary to law for the agency to determine that exp Federal's proposed Project Manager met the solicitation's requirements.

For the reasons explained below, the court finds that Sallyport has not met its burden of showing that the agency committed an error that prejudiced Sallyport. Therefore, the government and defendant-intervenor's cross-motions for judgment on the

2

administrative record are **GRANTED** and plaintiff's motion for judgment on the administrative record is **DENIED**.

## I.   FACTS

### A.   The Solicitation

The procurement at issue involves a firm fixed price Task Order ("Contract") for Electrical Safety Assessments, Repairs Program, Materials Management, and Control Services within the United States Central Command's Area of Responsibility ("CENTCOM AOR"), which includes Iraq, Jordan, Kuwait, the United Arab Emirates, Bahrain, and Qatar. AR 88-138. The Request for Quotations Letter No. 1037286 ("RFQ"), and accompanying Performance Work Statement ("PWS"),[1] issued on January 14, 2016, sought proposals to provide low voltage electrical power systems in the Middle East. The contractor would be required to inspect, update, and repair electric/life/safety hazards for low voltage electrical power systems for facilities that house United States service members. AR 122.

The solicitation provided that the contract would be awarded to the proposal that represented the "best overall value to the Government, with the appropriate consideration given to [ ] (3) evaluation factors." *Id*. at 88. The three factors for the award were: (1) technical approach; (2) price/costs and related information; and (3) past performance. *Id*. The RFQ stated that the bidder's technical approach was "slightly more important than price and significantly more important than past performance," and that price will be the

---

[1] This opinion refers to the RFQ and the PWS collectively as "the solicitation."

controlling factor if the "competing quotes are determined to be substantially equal after the evaluation of [the] [t]echnical [a]pproach and [p]ast performance." *Id.* The technical factor included seven tasks, each of which could receive a possible rating, from worst to best, of "Unacceptable," "Marginal," "Acceptable," "Good," and "Outstanding." *Id.* at 89. Each proposal would receive an overall technical rating on the same scale, which the solicitation explained as follows:

| Combined Technical/Risk Ratings | |
| --- | --- |
| Rating | Description |
| Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains at least one strength and no deficiencies. Risk of unsuccessful performance is low. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful contract performance is high. |
| Unacceptable | Proposal does not meet requirements and contains one or more deficiencies. Proposal is unawardable. |

As the chart indicates, a proposal with a "deficiency" will automatically be deemed unacceptable. Further, the agency must rate the overall technical approach "Acceptable" or better in order to award the contract. *Id.* at 88.

The RFQ included specific requirements for the some of personnel who would be performing the work, stating that a proposal must explain "how the offeror will meet the objectives of the PWS, and who will be performing the work." *Id.* at 89. The solicitation required that offerors identify and include résumés for key personnel, including the Project Manager. PWS Section 2.2, "Key Personnel Qualifications," stated that the Project Manager must meet the following requirements:

> Project Manager. The Contractor shall designate a Project Manager (PM) for the overall contract who provides a single Point of Contact (POC) for the [contracting officer], provides programmatic reporting to USACE, and can address overall management and contracting issues. This individual shall have at least 3 years experience in general contract project management on programs similar in size and complexity to the effort described in this PWS. The PM shall have a Project Management certification from an accredited institution. The resume/qualifications for the selected PM must be submitted with the proposal. Any subsequent change in PM must be approved by the [contracting officer].

AR 124. The RFQ provided the following additional requirements for the Project Manager and other "Key deployed personnel":

> Key deployed personnel (Project Manager, Quality Control Manager, Property Control Manager, and Site Safety and Health Officer) shall have 5 years minimum documented experience with 50 & 60 Hz electrical systems. These key personnel must have a Secret Security Clearance. They shall have a minimum of 1 year experience managing multiple teams working in remote environments. The government will evaluate documented experience supporting contingency or remote operations more favorably.

AR 89.

### B.    The Proposals

The agency received proposals from three companies: Sallyport, exp Federal (who

was the incumbent on this contract), and [xxxxx].  [xxxxx] received a "Marginal" overall

rating on its technical proposal and, because it did not receive an "Acceptable" rating or

better, was eliminated from the competition, AR 500.  Sallyport and exp Federal's

proposals, and the agency's evaluation, are discussed below.

### 1.    Sallyport's Proposal

Sallyport submitted its proposal on February 2, 2016, with a proposed total price

of $[xxxxxxxxxxxx] for the base and option periods.  *See id.* at 278-364.  Sallyport

proposed that two individuals would jointly serve as Project Manager.  The first Project

Manager, James Johnston, would be working from the continental United States and the

other, Kevin June, would be working on site in CENTCOM AOR and would also serve

as the Site Safety and Health Officer.  *Id.* at 282-88.  Though the proposal stated that Mr.

June would be serving as "On-site Project Manager," Mr. June does not have a project

manager certification as required by the PWS.  *Id.* at 298-99 (Mr. June's résumé); 124

(Project Manager qualifications).

On or around February 10, 2016, two Army project managers, Frederick Cartes

and Richard Locklair, conducted a technical evaluation of Sallyport's proposal.  *Id.* at

450.  The technical evaluation reiterated the rating scheme that was identified in the RFQ

and was used to rate each of the identified tasks.  *Id.*  Sallyport received a "Good" rating

in four out of the seven tasks and an "Acceptable" rating for Task 5, "other direct costs."

*Id.* at 462.  However, in Task 2, "Electrical Assessment, Update, and Repair," Sallyport

received an "Unacceptable" rating, thus receiving an overall "Unacceptable" rating in the

technical factor.  *Id.*  The "Unacceptable" rating was based on one "deficiency" and one

"weakness."  *Id.* at 459-68.

The technical evaluation determined that a "deficiency" existed in Sallyport's

proposal as a result of its Project Manager structure:

> **(Deficiency)** Project Manager James Johnston's resume demonstrates all of
> the requirements of PWS 2.2. The organization chart on p.5 Figure 1 shows
> James Johnston color coded as a key personnel, but that he is the CONUS
> Project Manager. Proposal p.3 section 1 states that Mr. June will handle
> operational activities and report to Mr. Johnston on a regular basis. Figure 1
> and section 1 show that the functions of the lead Project Manager are being
> performed by Mr. June, however RFQ page 2 specified that the PMP
> Project Manager will be forward deployed.

*Id.* at 460.  In other words, the agency found that the RFQ required the Project Manager

to be deployed to the worksite based on the RFQ's inclusion of the Project Manager in

the category of "Key deployed personnel."  *See* AR 89 ("Key deployed personnel

(*Project Manager*, Quality Control Manager, Property Control Manager, and Site Safety

and Health Officer) shall have 5 years minimum documented experience  . . . .").

However, under Sallyport's proposal, Mr. Johnston, who met the PWS's requirements

that a Project Manager have three years "experience in general contract project

management" on similar projects and "a Project Management certification from an

accredited institution," AR 124, as well as the RFQ's requirements all key personnel,

including the Project Manager, have the requisite electrical experience and a security

clearance, AR 89, would *not* be deployed.  Rather, Sallyport proposed that Mr. June (who

met the RFQ's technical requirements, but did not have the requisite Project Manager

certification) would be deployed as the Project Manager.  *Id.* at 289-90.  The agency

found that Sallyport's proposal contained a deficiency because Sallyport failed to propose

deploying a Project Manager meeting all the solicitation's requirements.

The technical evaluation also identified a "weakness" in Sallyport's proposal

because the agency found that Sallyport had an improper contract with the agency during

a "blackout" period.  *Id.* at 459.  The solicitation instructed that:

> The offeror shall NOT engage in any form of contact with installation
> personnel/or Installation DPW personnel regarding this requirement prior to
> submission of quotation and Task Order Award. Contact regarding the
> requirements set forth in this RFQ shall only occur with the Contract
> Specialist or Contracting Officer. Discussions or information obtained via
> other sources could make you ineligible for award if deemed a Conflict of
> Interest or a Violation of Procurement Integrity Act.

*Id.* at 92.  In its proposal, Sallyport included a statement indicating that it had a "recent"

communication with the agency:

> Based on our prior experience and recent communications with the 249th Prime
> Power Engineering Battalion who has performed this work in Jordan, we
> understand that grounding and bonding deficiencies are the predominant life
> safety hazard we may encounter.

*Id.* at 287.  The agency assumed that the contact occurred after the solicitation was issued

and found that the contact demonstrated a "'Weakness' regarding [Sallyport's]

understanding of the Contracting Officer's direction."  *Id.* at 459.   However, according to

a declaration from Sallyport's principal, David Banks, which the government does not

dispute, the meeting between Sallyport personnel and the agency occurred before the

solicitation was issued and was therefore not improper.  *See* Decl. of David Banks ¶¶ 3-7.

On March 23, 2016, the Contracting Officer, John Cominotto and the Contract Specialist, Kimberly Robinson, jointly prepared a Combined Pre-Negotiation Memorandum/Price Negotiation Memorandum ("POM/PNM"), which included a verbatim copy of the technical evaluation.  AR 489-91.   The body of the POM/PNM identified a "deficiency" with respect to Sallyport's proposed key Project Managers and "weakness" with respect to the agency's assumption that Sallyport had improper communications with the agency.  *Id.* at 495.   However, in the concluding paragraph, which summarized the technical evaluation, the POM/PNM document referred to two deficiencies instead of a deficiency and a weakness.  *Id.* at 500.  The POM/PNM concluded that Sallyport's proposal was rated "Unacceptable" and thus ineligible for award because it was "proposing a stateside Project Manager when the RFQ directly stated that the Project Manager should be forward deployed in the CENTCOM AOR." *Id.* at 500-501.

### 2.    exp Federal's Proposal

On February 2, 2016, exp Federal submitted its proposal which included a proposed price of $15,695,915.30 for the base and option periods.  *Id.* at 229-77.  For its Project Manager, exp Federal submitted the résumé of Khalil Al-Amin, which stated in the "Education" section that Mr. Al-Amin has a "Master Certificate, 2014, Mastering Project Management."  *Id.* at 249.  Mr. Al-Amin's resume also listed "additional education in . . . Project Management (Master Certificate)."  *Id.*  The agency's assessment of Task 2, which included key personnel, stated that "Project Manager Khalil

Al-Amin['s] resume demonstrates all of the requirements of PWS 2.2 and RFQ letter

p.2." *Id.* at 492. The agency assigned exp Federal a "Good" overall technical rating and

a "Good" rating on each of the subfactors except Task 5, "Other Indirect Costs," in

which exp Federal received an "Acceptable" rating. *Id.* at 491. The Army determined

that exp Federal's proposal was fair and reasonable and recommended that exp Federal

receive the award. *Id.* at 501. On March 31, 2016, exp Federal was awarded the

contract. *Id.* at 503.

### C.   Sallyport's GAO Protest

Sallyport filed a protest before the Government Accountability Office ("GAO") on

April 25, 2016. *Id.* at 573. Before the GAO, Sallyport complained that it had requested a

debriefing, but had not yet received one from the agency. *Id.* at 575. Sallyport argued

that the agency had not explained why it had found Sallyport's proposal unacceptable and

argued that had the agency evaluated the proposal according to the solicitation's criteria,

including taking into account the fact that Sallyport's proposed price was approximately

$[xxxxxxx] less than the awardee's, Sallyport would have had a substantial likelihood of

receiving the award. *Id.* a 576-77. The following day, April 26, 2016, the agency filed a

notice of corrective action stating that it would provide a post-award notice as required

under FAR § 8.405-2(d). *Id.* at 715. Sallyport withdrew its protest on May 2, 2016. *Id.*

at 716.

**D.    Sallyport's Complaint in this Court and Motion to Supplement the Administrative Record**

Sallyport filed is bid protest in this court on July 8, 2016, seeking preliminary and permanent injunctive relief.  *See* Compl., ECF No. 1.  On July 11, 2016, counsel for the government gave Sallyport a redacted version of the POM/PNM, which the government argues demonstrates that Sallyport's proposal was correctly rejected because of a deficiency with respect to Sallyport's proposed Project Manager. *See* Pl. Mot. to Supp. at 2, ECF No. 23.  On July 12, 2016, the court held an initial status conference setting an accelerated briefing schedule on the parties' cross-motions for judgment on the administrative record and Sallyport withdrew its request for preliminary injunctive relief. *See* Scheduling Order, ECF No. 14.

On July 18, 2016, Sallyport filed its motion to supplement the administrative record.  Pl. Mot. to Supp., ECF No 23.  Sallyport moved to supplement the administrative record with respect to three issues.  First, Sallyport asked the court to consider the declaration of Sallyport's principal, David Banks stating that the contact between Mr. Banks and the agency was before the blackout period and therefore not improper. Second, with respect to the agency's finding that the solicitation did not allow Sallyport to split the qualifications and responsibilities of a Project Manager between two individuals, Sallyport asked the court to consider the fact that Sallyport had successfully completed similar contracts with the same Project Manager structure it proposed in this procurement.  Third, Sallyport wished to offer evidence that the person Sallyport believed

to be exp Federal's proposed Project Manager did not meet the solicitation's certification requirements.

On July 22, 2016, the court granted Sallyport's motion in part and denied in part. Order, ECF No. 37. The court permitted Sallyport to supplement the record with paragraphs 1-10 of Mr. Banks's supplemental declaration, in which Mr. Banks stated that his communication with the agency occurred before the blackout period. Supp. Banks. Decl., ¶¶ 1-10, ECF No. 34-1. However, the court denied the motion to supplement with respect to all other issues. The court found that Sallyport's evidence that it had performed other contracts with the agency using a two-Project Manager structure was not relevant because the agency was not bound by its previous decisions and the relevant question was whether the agency had reasonably interpreted the solicitation for this procurement. *See Phoenix Mgmt., Inc. v. United States*, 125 Fed. Cl. 170, 178 (2016) (denying motion to supplement with identical procurement which the agency had corrected because it was unnecessary for judicial review); *Guardian Moving & Storage Co. v. United States*, 122 Fed. Cl. 117, 132 n.6 (2015) (denying motion to supplement with previous proposal that had been awarded the contract because the record was sufficient for judicial review). With respect to the third issue, the record demonstrated that Sallyport was mistaken as to the identity of exp Federal's proposed Project Manager and therefore supplementation not necessary.

Briefing on the parties' cross-motions for judgment on the AR was completed on August 30, 2016. The court held oral argument on October 27, 2016.

## II.     STANDARD OF REVIEW

The standard of review in the Administrative Procedure Act ("APA"), 5 U.S.C. §

706, governs the court's review of an agency action in a bid protest case.  *See* 28 U.S.C. §

1491(b)(4).  The APA standard is "highly deferential" to the agency's decision.

*Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

An agency's action may only be set aside if it was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  *Palladian Partners, Inc. v. United*

*States*, 783 F.3d 1243, 1252 (Fed. Cir. 2015) (quoting *Savantage Fin. Servs. v. United*

*States*, 595 F.3d 1282, 1285 (Fed. Cir. 2010)).  In that connection, "[t]he court's task is to

determine whether '(1) the procurement official's decision lacked a rational basis; or (2)

the procurement procedure involved a violation of regulation or procedure.'"  *Id*. (quoting

*Savantage*, 595 F.3d at 1285-86).  The court will find that an agency's decision is

"arbitrary and capricious when the agency 'entirely failed to consider an important aspect

of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or [the decision] is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise.'"  *Ala. Aircraft Indus., Inc.-*

*Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor*

*Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983)).

Further, even if the court finds agency action arbitrary and capricious, the court

must also "determine, as a factual matter, if the bid protester was prejudiced by that

conduct" before disturbing the results of a procurement.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  In order to establish prejudice, the protester must show that there was a "substantial chance" it would have received the award but for the agency's errors.  *Id.* (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1318-19 (Fed. Cir. 2003)).  "De minimis errors in the procurement process do not justify relief."  *Croman Corp. v. United States*, 106 Fed. Cl. 198, 216 (2012), *aff'd*, 724 F.3d 1357 (Fed. Cir. 2013) (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996)).

## III.   DISCUSSION

### A.   The Agency Reasonably Determined that Sallyport's Project Manager Proposal was Deficient

As discussed above, Sallyport proposed two individuals to fill the Project Manager position: Mr. Johnston, who met all of the solicitation's requirements would be working from the United States, and Mr. June, who did not have the required certification but would be deployed to the Middle East.  The agency concluded that Sallyport had "propos[ed] a stateside project manager when the RFQ directly stated that the Project Manager should be forward deployed to the CENTCOM AOR," AR 501, and therefore Sallyport's proposal contained a deficiency rendering it "Unacceptable" and ineligible for award.

Sallyport argues that the agency acted improperly when it concluded that the solicitation required the Project Manager to be deployed.  According to Sallyport, the solicitation "did not make the concept of 'deployment' of a proposed Project Manager a

mandatory minimum requirement, it did not make it a requirement at all."  Pl.'s MJAR

12.  The court disagrees with Sallyport and finds that the agency reasonably interpreted

the solicitation to find that it required a deployed Project Manager meeting all of the

solicitation's qualification requirements.   It is clear that the solicitation requires the

Project Manager to be deployed.  Looking first to the language directly addressing the

Project Manager and other key personnel in the RFQ, the court finds that the solicitation

clearly contemplates a deployed Project Manager:

> Key *deployed* personnel (Project Manager, Quality Control Manager,
> Property Control Manager, and Site Safety and Health Officer) shall have 5
> years minimum documented experience with 50 & 60 Hz electrical
> systems. These key personnel must have a Secret Security Clearance. . . . .

AR 89 (emphasis added).  The Project Manager is listed first in the category of key

"deployed" personnel that will be performing the work under the contract.  As the

government notes, the natural reading of that section of the solicitation demonstrates that

the "Project Manager" is included in the category of "Key deployed personnel."  Thus,

the RFQ unambiguously required that the Project Manager be deployed.

Sallyport reads the "key personnel" language quoted above as only setting the

requirements for the key personnel if the contractor *chooses* to deploy that person.  In

other words, the contractor is not required to deploy a Project Manager, or any other key

personnel, but if it does choose to deploy them, they must have certain specified

qualifications (such as a security clearance and electrical experience, *see* AR 89).  The

court finds this to be a strained, unnatural reading of the solicitation's language.  In

addition, Sallyport's reasoning would mean that deploying any key personnel was

optional, including those who must necessarily be on site to do their jobs such as the Property Control Manager and the Site Safety and Health Officer.

Moreover, the solicitation's language read in context of the solicitation as a whole, *see Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1354 (Fed. Cir. 2004), confirms that the solicitation contemplated that the Project Manager would be deployed. The Project Manager acts as the "single Point of Contact (POC) for the KO, provides programmatic reporting to USACE, and can address overall management and contracting issues." *Id.* at 124. In addition, the Project Manager, and all "Key deployed personnel," are required to have "a minimum of 1 year experience managing multiple teams working in remote environments." *Id.* at 89. These specifications demonstrate that the Project Manager must be deployed to the work site to be effective. Other provisions in the solicitation further support the conclusion that the Project Manager has to be deployed. For example, the solicitation stated that the Project Manager is "authorized a vehicle" and a satellite phone to insure that required tasks are performed, both of which would be unnecessary if the work could be performed from the United States. *Id.* at 130, 133. In addition, the solicitation stated that after the award, the Army would hold a "[k]ick-off meeting" to "brief key personnel" which would take place via video teleconference at "key locations, prior to personnel pushing from hubs [*i.e.*, Kuwait and Jordan] to the work areas." *Id.* at 132 (kick-off meeting requirement); *id.* at 125 (defining hub).

Sallyport argues that, even if the solicitation required the Project Manager to be deployed, Sallyport's proposal met that requirement by proposing that Mr. June serve as

the deployed Project Manager.  In effect, Sallyport is arguing that two individuals, neither of which meets all of the solicitation's requirements independently, can satisfy the terms of the solicitation when combined together.  Sallyport notes that the PWS and the RFQ contain different descriptions for the Project Manager, with the RFQ detailing the required technical experience, *see* AR 89 (key personnel, including Project Manager must have "5 years minimum documented experience with 50 & 60 Hz electrical systems"), and the PWS discussing the managerial requirements (Project Manager "shall have at least 3 years experience in general contract project management on programs similar in size and complexity" and a "Project Manager certification from an accredited institution").  Sallyport argues that the "two distinct skill sets described in the RFQ and PWS contemplate that offerors can best meet the Agency's needs by proposing two individuals to meet the requirements of the solicitation."  Pl.'s MJAR 22.

The court disagrees and finds that the solicitation plainly required that a single individual meet all the solicitation's requirements, including the deployment requirement, to serve as the Project Manager.  The fact that the solicitation contains two sets of requirements for the Project Manager does not imply that solicitation contemplated two individuals would fill that position.  While the RFQ sets forth the high-level requirements for all key personnel, i.e. the Project Manager, Quality Control Manager, Property Control Manager, and Site Safety and Health Officer must have a security clearance and electrical experience, the PWS contains additional requirements specific to each of the four positions.  Rather than implying that the requirements for any of these positions can

be split amongst two people, the solicitation contemplates that an individual proposed for

each position must meet the requirements in both the PWS and the RFQ.

Sallyport also argues that a dual Project Manager structure was allowable because

the solicitation contemplated that another position, the Site Safety and Health Officer,

could be filled by an individual also acting as the Project Manager.  *See* AR 124

("Individual Site Safety and Health Officer need not be a full time responsibility.  This

position can be dual hatted with one other key personnel position.").  However, the court

finds that the fact that a Project Manager was also permitted to serve as the Site Safety

and Health Officer has no bearing on the question of whether multiple individuals could

jointly act as Project Manager.  As the government notes, the solicitation refers to the

Project Manager using singular pronouns, adjectives, and verbs:

> Project Manager. The Contractor shall designate *a* Project Manager (PM)
> for the overall contract who provides a *single* Point of Contact (POC) for
> the KO, provides programmatic reporting to USACE, and can address
> overall management and contracting issues. *This individual* shall have at
> least 3 years experience in general contract project management on
> programs similar in size and complexity to the effort described in this PWS.
> *The* PM shall have a Project Management certification from an accredited
> institution. *The* resume/qualifications for *the* selected PM must be
> submitted with the proposal. Any subsequent change in PM must be
> approved by the KO.

AR 124 (emphasis added).  In addition to the solicitation's grammatical implication that

the Project Manager is to be one person, the solicitation specifically refers to the Project

Manager as a "single Point of Contact" with the agency.  *Id.*  This characterization

demonstrates the agency's determination that communication with the contractor would

be most efficient if streamlined through one previously-identified individual meeting all of the solicitation's requirements.

Finally, Sallyport argues the agency acted arbitrarily and capriciously in finding that a deployed Project Manager was a mandatory requirement and could thus give rise to a "deficiency" under the terms of the solicitation.  The solicitation stated that if a proposal "does not meet the requirements and contains *one or more deficiencies*," the "[p]roposal is unawardable" and will be deemed "unacceptable."  AR 89 (emphasis added).  Sallyport cites case law stating that a "mandatory minimum requirement must be clearly identified as such within the solicitation so as to 'put offerors on notice' of the serious consequences of failing to meet the requirement."  *ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 67 (2001), *aff'd*, 30 F. App'x 995 (Fed. Cir. 2002) (quoting *Isratex, Inc. v. United States*, 25 Cl. Ct. 223, 229 (1992).[2]   According to Sallyport, the agency erred in finding a "deficiency" because the solicitation did not put it on notice that the deployment requirement would be treated as a disqualifying.  Sallyport argues that when the solicitation created mandatory requirements, it used clearly mandatory language, i.e., the Project Manager "*shall* have at least 3 years experience in general contract project management."  AR 124 (emphasis added).  Sallyport argues that because the solicitation did not state that the Project Manager "shall" be deployed,

---

[2] Sallyport also argues that the agency acted unreasonably in making a deployed Project Manager a mandatory requirement because Sallyport had previously performed contracts with the agency in remote locations using a Project Manager working remotely from the United States.  However, as discussed above, the court has already denied Sallyport's motion to supplement the administrative record with respect to this issue.

Sallyport it did not understand that deployment of the Project Manager was a mandatory requirement.

The court finds that Sallyport's arguments are without merit. As discussed at length above, the solicitation clearly required offerors to identify a single Project Manager meeting all the solicitation's requirements as one of the key personnel to be deployed. Given the plain language of the solicitation, the court finds that Sallyport was on notice that deployment of a Project Manager was a mandatory requirement. Moreover, to the extent Sallyport had any question about whether the Project Manager needed to be deployed, the RFQ gave Sallyport an opportunity to ask questions to the contracting officer "regarding the requirements set forth in this RFQ." *Id.* at 92. It is simply too late for Sallyport to now question the requirements in the RFQ.[3]

Accordingly, for all of the above stated reasons, the court finds that the record supports the agency's finding that Sallyport's proposed Project Manager structure was a deficiency rendering Sallyport's proposal unacceptable.

---

[3] The government argues that, to the extent that Sallyport is arguing that the requirement was ambiguous, any ambiguity was patent and thus Sallyport waived its right to challenge the deployment requirement by failing to challenge the requirement before proposals were submitted. *See Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) (finding that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."). While the court finds that the solicitation was not ambiguous, to the extent Sallyport was confused as to whether deployment of the Project Manager was mandatory because the agency did not use the term "shall," that issue was clear from the face of the solicitation and because it was not hidden it had to be raised at the proper time either before the agency or court.

### B.     The Agency's Treatment of Sallyport's Alleged Improper Contact did not Impact the Outcome of the Procurement

As discussed above, the agency gave Sallyport's proposal a "weakness" because the agency believed, based upon a statement in Sallyport's proposal that Sallyport employees had "recent" communication with the agency, that Sallyport had improperly contacted the agency during the blackout period where no contact between the agency and the bidders was permitted.  *See* AR 459.  The court allowed Sallyport to supplement the administrative record with the declaration of Mr. Banks stating that the contact between Mr. Banks and the agency was before the blackout period and therefore not improper.  The agency does not challenge Sallyport's sworn testimony that the contact actually came before the blackout period, but maintains that the agency nevertheless acted reasonably in interpreting the word "recent" to mean the contact occurred during the approximately two-week blackout period after the solicitation was issued and before proposals were due.

The court finds that the agency's assumption was arbitrary and capricious.  In its proposal, Sallyport stated that:

> Based on our prior experience and recent communications with the 249th Prime Power Engineering Battalion who has performed this work in Jordan, we understand that grounding and bonding deficiencies are the predominant life safety hazard we may encounter.

AR 287.  In the technical evaluation, the agency found, based on that sentence, that:

> Sallyport contacted the 249th prime power, but did not request or receive authorization from the Contract Specialist or Contracting Officer to obtain information pertaining to this RFQ. This demonstrates a "Weakness"

regarding the company's understanding of the Contracting Officer's direction.

*Id.* at 459.  According to Mr. Banks's declaration, Sallyport's representative actually met with the contracting officer on May 26, 2016.  *See* Banks Decl. ¶¶ 4-6.  The court finds that agency acted unreasonably in assuming, without seeking any confirmation from within the agency itself, that the "recent" communication had occurred within the two-week blackout period and not before.

However, the court finds that the agency's error here did not have an impact on the outcome of the procurement and thus did not prejudice the plaintiff. [4]  The court has found that the agency acted within its discretion when it identified a deficiency based upon Sallyport's failure to propose a deployed Project Manager meeting all of the solicitation's requirements.  This deficiency by itself was sufficient grounds for the agency to eliminate Sallyport from the competition.  *See* AR 89 (stating that if the proposal "does not meet the requirements and contains *one or more* deficiencies," the "[p]roposal is unawardable" and will be deemed "unacceptable") (emphasis added). [5]

---

[4] Sallyport argues that had it improperly been in contact with the agency, presumably to attempt to obtain information not available to other competitors, the contracting officer would have been required to report the matter.  *See generally* FAR § 3.104-7(a) and (b).  In this case, no such report was made.  However, because the court finds there was no effect on the outcome of the case, the court need not decide if this section applies.

[5] The technical evaluation refers to the alleged improper contact as a "weakness."  AR 459.  However, the POM/PNM memorandum describes the contact as a "weakness" in the body of the document while specifically discussing the issue, *id.* at 495, but refers to the contact as a "deficiency" in the conclusion, *see id.* at 500-01 ("Sallyport's Technical proposal was rated unacceptable for two deficiencies.").  The government conceded that the POM/PNM's statement that there were two deficiencies was an error and that the record supports one deficiency and one weakness.  Def.'s MJAR at 12 n.3.  However, because one deficiency was sufficient to eliminate

Because Sallyport has not demonstrated that it had a "substantial chance" that it would have been awarded the contract but for the agency's error, Sallyport has not demonstrated prejudice from that error and therefore has not met its burden of showing that the award should be set aside.

### C.   The Agency Reasonably Evaluated exp Federal's Proposal

In addition to arguing that the agency was arbitrary and capricious in giving Sallyport's proposal a deficiency, Sallyport argues that the agency erred in its evaluation of exp Federal's proposal, which, according to Sallyport, should have been found deficient.  As discussed above, the court has found that the agency's determination that Sallyport's proposal contained a deficiency was supported by the record in this case.  The government argues that the court's inquiry should end there because Sallyport was correctly found to have submitted an unacceptable proposal and thus lacks standing because it would not have received the award even if the agency incorrectly evaluated exp Federal.  The court disagrees.  If the court finds the agency should have found that all three bidders submitted unacceptable proposals,[6] then the court would have to remand to the agency to either repeat the bidding process or for further negotiations.  *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir.

---

a competitor, this court finds that the error in the POM/PNM was harmless.  Sallyport argues that referring to the alleged contact as a "deficiency" demonstrates that the agency was unfairly harsh in evaluating Sallyport's proposal.  The court finds that this was simply an error in the conclusion of the POM/PNM, which refers to the contact as a "weakness" elsewhere in the document, and not evidence of the agency's bias.

[6] No party disputes that the third bidder, [xxx] was correctly assigned a lower-than-acceptable rating on its technical proposal, *see* AR 500.

2001).  The Federal Circuit has found that a protestor has demonstrated prejudice in such circumstances.  *See Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1360 (Fed. Cir. 2015).  The court will therefore turn to Sallyport's arguments regarding exp Federal's proposal.

Sallyport argues that exp Federal's proposed Project Manager, Khalil Al-Amin, does not meet the solicitation's requirement that a Project Manager have a project management certification.  The PWS states that the Project Manager "shall have a Project Management certification from an accredited institution."  AR 124.  Mr. Al-Amin's résumé in exp Federal's proposal states that Mr. Al-Amin has a "Master Certificate, 2014, Mastering Project Management" and that he has "additional education in . . . Project Management (Master Certificate)."  AR 249.  Sallyport states that "[i]nformation that Mr. Al-Amin has published publically about himself states that his certificate was issued by Villanova University."  Pl.'s MJAR 30.  According to Sallyport, "[a] Project Manager 'Master *Certificate*' is not remotely the same as a "Project Management certification from an accredited institution."  *Id.*  Sallyport asserts that "a Project Management *certificate* program" at a university "merely prepares an individual to complete the Project Management *certification* process."  *Id.* at 31.  Sallyport asserts that universities, including Villanova, provide training to prepare individuals for certification exams, almost exclusively the Program Management Institute's ('PMI') Project Management Professional ('PMP') certification exam," though Sallyport does identify

two other small international organizations that it also could also provide the type of "certification" required by the solicitation.  *Id.*

The government and defendant-intervenor argue, and the court agrees, that Sallyport's arguments regarding the distinction between a certificate and a certification in project management relies on evidence outside of the administrative record.  The solicitation does not require a specific type of certification, stating only that the certification must come from "an accredited institution."  AR 124.  In contrast, on the same page as the certification requirement for the Project Manager, the solicitation states that bidders must include at least two Master Electricians in their proposals who are either licensed as Master Electricians by a state or have a "Level 4 NVQ Diploma in Installing Electro Technical Systems and Equipment from an accredited organization registered with the Office of Qualifications and Examinations regulation in the United Kingdom."  *Id.* at 124-25.  In addition, the solicitation requires that the proposed Property Control Manager be a "Certified Professional Property Administrator (CPPA)" and states that a "Certified Professional Property Manager (CPPM) is preferred."  *Id.* at 124.  These provisions demonstrate that had the agency intended the proposed Project Manager to hold a specific type of certification from one of a very small number of certifying organizations, it would have said so.

Moreover, the agency's interpretation of "certification" to include the certificate held by Mr. Al-Amin is supported by the language of the solicitation, which appears to use the terms "certificate" and "certification" interchangeably.  The PWS states that

"[p]rior to mobilizing any personnel, all required *certificates/licenses* shall be filed with the KO and reviewed by the COR.  These *certificates/licenses* shall provide sufficient confirmation that the minimum standards are met for each individual proposed to be sent forward or assigned to the project for support from Continental United Sates (CONUS)."  *Id.* at 122 (emphasis added).  The words "certificates/licenses" in that section plainly include the required "certification" for the Project Manager described in the same document.   The court agrees with the defendants that the agency reasonably interpreted the term "certification" to include the "Master Certificate" in project management listed in Mr. Al-Amin's résumé.  Accordingly, the court finds that Sallyport has not met its burden to show that it was unreasonable, arbitrary, or capricious for the agency to determine that the "Master Certificate, 2014, Mastering Project Management" listed in Mr. Al-Amin's résumé, *id.* at 249, satisfied the solicitation's requirement that a proposed Project Manager have a "Project Management certification from an accredited institution."  *Id.* at 124.

## IV.   CONCLUSION

For the reasons stated above, the Sallyport's motion for judgment on the administrative record is **DENIED**.  Further, Sallyport's request for injunctive relief is **DENIED**.  The government and exp Federal's motions for judgment on the administrative record are **GRANTED**.  The clerk is instructed to enter judgment accordingly.  No costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone

NANCY B. FIRESTONE
Senior Judge